OPINION
Artis Reddish[1] was found guilty of two counts each of rape and robbery and one count each of kidnaping, theft, and gross sexual imposition by a jury in the Montgomery County Court of Common Pleas and was sentenced accordingly. He appeals from his conviction.
On July 17, 1997, Artis Reddish was indicted for seven counts stemming from two separate incidents. The first six counts were based on an incident involving Renee Moon and included counts I and II of rape, count III of kidnaping with a sexual motivation, count IV of robbery, count V of theft of a motor vehicle, and count VI of gross sexual imposition. Count VII was for robbery and was based on an incident involving Betty Slauter. On March 19, 1998, a jury found Reddish guilty of all seven counts. On May 5, 1998, he was sentenced as follows: ten years for count I; ten years for count II; ten years for count III; five years for count IV; eighteen months for count V; eighteen months for count VI; and five years for count VII, with the sentences for counts I and II being concurrent with each other and for counts III, IV, V and VII being consecutive to each other and consecutive to counts I and II. It is unclear from the record whether the sentence for count VI was concurrent or consecutive.
The state's evidence presented at the hearing on the motion to suppress and the jury trial established the following. In our discussion of the facts of this case, we will not note whether the evidence was presented at the hearing on the motion to suppress or at the jury trial. In our review of the assignments of error, however, we will make it clear where the evidence originated.
On May 24, 1997, at approximately 11:00 p.m., Renee Moon left her home in her car, planning to visit a friend. Although she knew that her friend lived on Shaftesbury, a street in the city of Dayton, she was unable to locate the residence. She went to a phone booth located in front of a post office to call her friend and, while she was pulling her car to the curb in front of the phone booth, she noticed a man, Reddish, walking up the opposite side of the street. She got out of her car and walked about eight steps to the phone to call her friend. Her friend was not home, so Moon left a message on an answering machine. While she was calling her friend, Moon saw Reddish cross the street and walk past her. Moon then hung up the phone and started back toward her car. Before she could reach the car, Reddish grabbed her from behind by her neck. He demanded her keys and she gave them to him. He then pulled her over to the car and asked if she had any money. When she responded that she did not have money, Reddish got into her car and, while still holding her, searched through the armrest and found approximately $5.00 in change. Reddish asked for her purse, but Moon told him that she did not have one with her.
Reddish then got out of the car and pulled Moon into the post office parking lot. He forced her between two mail trucks and slammed her head into one of the trucks. When she fell to her knees as a result of the blow, he pulled her up by her hair, and attempted to force her to give him oral sex. When she refused, he threw her down and pushed her. Reddish put his hand down the front of Moon's dress. After removing his hand from the front of her dress, he inserted a finger into her vagina. When she started to scream, he "stomped [her] in the face." He tore off her underwear and inserted his finger into her vagina again. He then pulled her to the front of one of the mail trucks and took her gold watch and gold necklace. Reddish left the post office in Moon's car.
Following the attack, Moon walked to her parents' house, which was nearby, and her father notified the police. When Moon returned to the post office with a police officer a short while later, they found her underwear and broken glasses. That night, Moon gave the police a description of her attacker. A couple of days later, she went to the police station and looked unsuccessfully through approximately thirty photospreads, each with six pictures of potential suspects. A composite of her attacker was also drawn but a suspect was not located. Moon's car was later located in an alley.
On the morning of June 20, 1997, Betty Slauter drove to the Miami Valley Hardware store on Salem Avenue to make some photocopies. After her copies were made, Slauter returned to her car in the parking lot. While she was sitting in her car looking at the quality of the copies, Reddish opened the door, restrained her with one arm and reached across her with the other arm to snatch her purse off the passenger seat. As Reddish removed the purse, he pulled Slauter out of the car and she fell to the ground. Reddish then ran away.
Slauter returned to the store to inform a security guard of the attack. She gave the security guard, Lloyd Blandenburg, a description of her attacker, stating that he had been heavyset with "very short hair" and a skin tone that matched hers and that he had worn a striped shirt. Blandenburg realized that her description fit a man that he had noticed approximately thirty minutes earlier sitting on the steps of a laundromat that was near the hardware store. He looked outside to find that the man who had been sitting on the steps near the store was no longer there. Blandenburg then notified the Dayton police.
In search of the man, Blandenburg walked down an alley near the store that led to some apartments. As he approached the apartments, he noticed two men standing outside talking and he asked if either of them had seen a man fitting Slauter's description. One of the men, Brian Hollins, stated that he had just seen a man fitting that description walk down the alley and into an apartment in the building. The other man, Terry Furlow, stated that he had witnessed a man fitting that description "messing around" in the bushes near the alley during his conversation with Hollins. Although Furlow could not recall what the man he had seen was wearing, Hollins stated that the man had worn a striped shirt.
At this point, Officers William Welz and Robert Davis arrived at the apartment building and Blandenburg informed them of what he had discovered. The officers immediately went to the apartment that Reddish had entered and knocked on the door. Reddish answered the door and the officers informed him that they were investigating a crime. When asked about his recent whereabouts, Reddish stated that he had been in his apartment all day. Although the officers could feel the air conditioning from the apartment in the hallway, Reddish was sweating profusely and was not wearing a shirt.
After Reddish stepped out into the hallway, Officer Davis entered the apartment "for [his] own safety" as well as the safety of Officer Welz. While inside, Officer Davis noticed a sweaty striped shirt on the floor in the bedroom. He carried the shirt to the hall and asked Reddish, "What is this?" Reddish did not respond. He took the shirt back into the apartment and left it where he found it.
Reddish was then placed into a police cruiser and taken to the hardware store. When Slauter was asked whether she could identify Reddish, she became confused because Reddish's clothes were different from those of her attacker. She had not seen her attacker's face, but she had seen his back, arm, and shoulders. Based upon these characteristics, Slauter told the police that Reddish "looked like the man that was running away from the car," but she could not say with certainty that he was the attacker.
Detective Christen Beane obtained a search warrant for the apartment where the police had found Reddish. While executing the warrant, she found the sweaty striped shirt that Officer Davis had located earlier. At trial, Blandenburg testified that this shirt was the same shirt that he had seen on the man who was sitting on the steps by the hardware store before the incident. Hollins testified that this shirt was similar to the one he had seen on the man walking up the alley. Slauter testified, however, that she did not think this shirt was the one that her attacker had been wearing.
While investigating the robbery of Slauter, Detective Beane, who was also investigating the robbery part of the attack of Moon, noticed a number of similarities between the two incidents. She realized that the attacks had occurred within a few blocks of each other, that Reddish lived in the same area, and that both crimes had started with a robbery. Based on this observation, Detective Beane created a photospread containing pictures of six individuals, including Reddish, and showed it to Moon. Moon immediately picked Reddish from the photospread and stated that he was her attacker. Reddish's photo had not been among the photospreads that Moon had looked at while at the police station.
Reddish filed three motions to suppress arguing, among other things, that the protective sweep was illegal, that there was no probable cause for the search warrant, and that the show-up was prejudicially suggestive. On September 30, 1997, the trial court conducted a hearing on these motions. The trial court overruled the motions to suppress on January 28, 1998.
On March 9, 1998, Reddish filed a motion for severance arguing, among other things, that the trial court should sever counts I through VI from count VII and try the matter separately as to each victim. The trial court denied this request on March 13, 1998.
Although the defense did not present any witnesses at trial, Reddish told the trial judge before sentencing that he "maintain[ed] [his] innocence on all [the] charges." He was sentenced as described supra on May 5, 1998. On July 15, 1998, Reddish requested leave to file a delayed appeal, and we granted his motion on August 19, 1998.
Reddish asserts four assignments of error.
 I. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO SEVER COUNT VII FROM COUNTS I THROUGH VI WHEN JOINDER WAS PREJUDICIAL UNDER OHIO CRIMINAL RULE 14.
Reddish argues that, although the joinder of counts I through VII was permissible under Crim.R. 8, the joinder prejudiced him at trial and thus should not have been permitted under Crim.R. 14. Specifically, Reddish asserts that the jury cumulated evidence of the two incidents and found him guilty when, if the jury had considered the evidence of the two incidents separately, it would not have found him guilty as to both.
Crim.R. 8(A) permits joinder when the charged offenses "are of the same or similar character." It is well-established that the law favors joinder because the avoidance of multiple trials conserves time and expense and minimizes the potentially incongruous outcomes that can result from successive trials before different juries. State v. Schiebel (1990), 55 Ohio St.3d 71,86-87, 564 N.E.2d 54, 71; State v. Torres (1981), 66 Ohio St.2d 340,343, 421 N.E.2d 1288, 1290; State v. Thomas (1980), 61 Ohio St.2d 223,225, 400 N.E.2d 401, 404.
Under Crim.R. 14, however, "[i]f it appears that a defendant * * * is prejudiced by a joinder of offenses * * *, the court shall order an election or separate trial of counts * * *." To affirmatively show that his rights have been prejudiced, the defendant "must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial." State v. Lott (1990), 51 Ohio St.3d 160,163, 555 N.E.2d 293, 298; Torres, at syllabus.
"A Crim.R. 14 motion for severance of counts due to prejudicial misjoinder is waived unless it is renewed at the close of the state's case or at the conclusion of all the evidence."State v. Miller (1995), 105 Ohio App.3d 679, 691,664 N.E.2d 1309, 1317, citing State v. Strobel (1988), 51 Ohio App.3d 31,554 N.E.2d 916, paragraph two of the syllabus; State v. Owens (1975),51 Ohio App.2d 132, 366 N.E.2d 1367, paragraph two of the syllabus. Although Reddish made a pretrial motion for severance, the record reveals that he failed to renew his pretrial motion to sever counts I through VI from count VII at the close of the state's case or at the close of all the evidence. Therefore, Reddish waived his objection to the trial court's ruling on this issue.
Accordingly, the plain error standard of Crim.R. 52(B) governs our review of the trial court's ruling on Reddish's motion to sever. See Miller, 105 Ohio App.3d at 691, 664 N.E.2d at 1317. Crim.R. 52(B) allows us to address "[p]lain errors or defects affecting substantial rights" regardless of whether they were properly challenged in the trial court. Notice of plain error pursuant to Crim.R. 52(B) can only be taken, however, "with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." Miller, 105 Ohio App.3d at 691,664 N.E.2d at 1317, citing State v. Long (1978), 53 Ohio St.2d 91,372 N.E.2d 804, paragraph three of the syllabus. "The plain error test requires that, but for the existence of the error, the result of the trial would have been otherwise." State v. Wiles (1991),59 Ohio St.3d 71, 86, 571 N.E.2d 97, 116, certiorari denied (1992), 506 U.S. 832, 113 S.Ct. 99, 121 L.Ed.2d 59, citing Long,53 Ohio St.2d at 97, 372 N.E.2d at 808.
The state can negate the defendant's claim of prejudice in two different ways. Under the first method, referred to as the "other acts" test, the state must demonstrate that the evidence to be introduced at the trial of one offense would also be admissible at the trial of the other severed offense under the "other acts" portion of Evid.R. 404(B). Lott, 51 Ohio St.3d at 163,555 N.E.2d at 298; Miller, 105 Ohio App.3d at 691, 664 N.E.2d at 1317; Statev. Van Sickle (1993), 90 Ohio App.3d 301, 305, 629 N.E.2d 39,41-42. Under the second method, called the "joinder test," "the state is not required to meet the stricter `other acts' admissibility test, but is merely required to show that evidence of each crime joined at trial is simple and direct." Lott,51 Ohio St. 3d at 163, 555 N.E.2d at 298. The purpose of the "joinder test" is to prevent the jury from confusing the offenses or from improperly cumulating the evidence of the various crimes.Van Sickle, 90 Ohio App.3d at 307, 629 N.E.2d at 43, citing Lott,51 Ohio St.3d at 163-164, 555 N.E.2d at 298-299. The "joinder test" "focuses on whether the trier of fact is likely to consider evidence of one [offense] as corroborative of the other." Wiles,supra, 59 Ohio St.3d at 77, 571 N.E.2d at 108 (citation omitted).
Reddish asserts that the jury cumulated the evidence of the crimes against Moon and Slauter to convict him of both attacks. Specifically, he argues that because Slauter was unable to make a definitive identification of him at the scene of the attack and because she testified that she did not think that her attacker was wearing the shirt that was found at the apartment, "the jury could have concluded from the cummulated [sic] evidence that [Reddish] had to be the man involved in both instances."
The record of the trial reveals that Blandenburg testified that he saw Reddish on the laundromat steps near the hardware store approximately thirty minutes before Slauter was attacked. Hollins testified that he saw Reddish walking down the alley shortly after the incident occurred. Furlow testified that he saw Reddish "messing around" in the bushes at the exact location where Slauter's purse was found. Officers Welz and Davis both testified that, when Reddish came to the apartment door, he was sweating profusely even though he told them that he had been home all day and they could feel the air conditioning from the apartment coming out into the hallway. Based upon this evidence, we cannot conclude that if count VII had been severed from counts I through VI, Reddish would not have been convicted of count VII. There was ample evidence that Reddish had been the attacker and we are unpersuaded that the result would have been otherwise if the trial court had granted Reddish's motion for severance.
The first assignment of error is overruled.
 II. THE TRIAL COURT ERRED TO DEFENDANT-APPELLANT'S PREJUDICE WHEN IT OVERRULED DEFENDANT-APPELLANT'S MOTION TO SUPPRESS.
Reddish's argument is three-fold. First, he argues that "the trial court failed to suppress evidence obtained during * * * an illegal, warrantless search which was executed under the pretext of a `protective sweep.'" Second, he argues that "the trial court failed to suppress evidence obtained while effectuating a search warrant wherein the basis of the search warrant was the evidence uncovered during a previous illegal, warrantless search." Third, he argues that "the trial court failed to suppress the results of and testimony regarding a suggestive and unreliable `show-up' identification." We will address these arguments in the order that facilitates our discussion.
 "When considering a motion to suppress, the trial court assumes the role of the trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of the witnesses." State v. Clary (Sept. 30, 1996), Lawrence App. No. 96CA7, unreported, at *2, citing State v. Mills (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972, 982. Thus, "in its review, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." Clary, at *2, citing State v. Guysinger (1993), 86 Ohio App.3d 592, 594, 621 N.E.2d 726, 727. The appellate court must, however, determine de novo whether the trial court's conclusions of law, based on those findings of fact, are correct. State v. Klein (1991), 73 Ohio App.3d 486, 488, 597 N.E.2d 1141, 1143.
The Fourth Amendment bars unreasonable searches and seizures.Maryland v. Buie (1990), 494 U.S. 325, 331, 110 S.Ct. 1093, 1096,108 L.Ed.2d 276, 284 (citation omitted). Warrantless searches areper se unreasonable unless they fall within a carefully defined group of exceptions. Katz v. U.S. (1967), 389 U.S. 347, 357,88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585.
Reddish argues that the trial court erred when it concluded that there had been probable cause, aside from the evidence discovered in Officer Davis's prior search, to issue a search warrant. He asserts that the search warrant was based upon Officer Davis's discovery of the striped shirt during his search of the apartment.
"The trial court's legal determinations as to probable cause * * *, based on the historical facts, are subject to de novo
review." State v. Martin (Nov. 14, 1997), Montgomery App. No. 16256, unreported, at *1. "In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, `[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the `veracity' and `basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Statev. George (1989), 45 Ohio St.3d 325, 544 N.E.2d 640, paragraph one of the syllabus, quoting Illinois v. Gates (1983), 462 U.S. 213,238-239, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548.
The search warrant in this case was issued by a Dayton municipal court judge. The warrant was issued in search of the following property: "(1) a multi colored mens stripped [sic] shirt"; "(2) a dark pair of shorts"; "(3) personal papers and property belonging to Betty Slauter." The affidavit given in support of the search warrant lists the following facts:
 1. On June 20, 1997 at 11:05 am a BM 5'9" 230-250 lbs approached an elderly female who was sitting in her vehicle in the parking lot at 2818 Salem Ave. The male, wearing a stripped shirt, with red/oge/blu [sic] stripes, dark shorts, reached in and snatched her purse from her hands/arms and began to pull at it and forced it from her hands. He fled with the purse to the rear of 2818 Salem Ave. In a struggle with the complainant, suspect injured her hand.
 2. Seconds later, the apartment owner of 2908 Prescott Ave observed the suspect in the bushes hiding the complainant's purse. The suspect was still dressed in the same clothing at the time of the robbery. While the apartment owner watched along with another tenant, the suspect entered the apartment building and entered apartment number 202. No one saw him leave the apartment.
 3. The police arrived and located him in apartment number 202 and placed him under arrest. The bushes that the suspect had been in earlier was checked and the complainat's [sic] purse was found, opened and a wallet found, opened.
 4. At the time of the suspect's arrest, the suspect was dressed different from what he had on minutes before and stated that he had not left the apartment.
There is no mention of Officer Davis's prior discovery of the wet striped shirt in the affidavit for the search warrant. Thus, Reddish's argument that the discovery of the striped shirt was the basis for the search warrant is not persuasive.
The affidavit stated that the suspect was wearing a striped shirt at the time of the attack and "seconds later" in the bushes, that Slauter's purse was found in the bushes, and that at the time of his arrest, the suspect was dressed differently. The affidavit also stated that the suspect entered apartment 202 and had not left. Thus, regardless of Officer Davis's discovery of the striped shirt, the judge who issued the search warrant knew that the suspect observed by several witnesses had entered apartment 202. We cannot conclude that the municipal court judge who issued the search warrant erred when he decided that, based upon these facts, there was a fair probability that evidence of the crime would be found in apartment 202.
Reddish also argues that, under the derivative evidence rule and the exclusionary rule, the items found during the execution of the search warrant should have been suppressed because they were obtained as a result of an illegal warrantless search. Reddish further contends that the trial court erred when it concluded that the seizure of the shirt was authorized by the doctrine of inevitable discovery. He argues that because the police had already arrested him as their suspect and had recovered Slauter's purse, "there was no reason for the police to require a warrant to search the apartment but for the striped shirt."
The exclusionary rule bars admission not only of evidence which is the direct result of a constitutional violation but also evidence which is the indirect result of such a violation, so called derivative evidence or "fruit of the poisonous tree." WongSun v. United States (1963), 371 U.S. 471, 485, 83 S.Ct. 407, 416,9 L.Ed.2d 441, 454; Clary, at *3. Derivative evidence does not need to be suppressed, however, where that evidence falls under one of the exceptions to the derivative evidence rule. State v.Myers (1997), 119 Ohio App.3d 376, 382, 695 N.E.2d 327, 331. One such exception is the inevitable discovery doctrine. State v.Perkins (1985), 18 Ohio St.3d 193, 480 N.E.2d 763, syllabus, adopting the rule set forth in Nix v. Williams (1984),467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377.
The inevitable discovery doctrine allows the admission of illegally obtained evidence where "it is established that the evidence would have been ultimately or inevitably discovered during the course of a lawful investigation." Perkins, at syllabus. The state bears the burden of showing "within a reasonable probability that police officials would have discovered the derivative evidence apart from the unlawful conduct." Id. at 196, 480 N.E.2d at 767. Proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." Nix v.Williams, 467 U.S. at 445, 104 S.Ct. at 2509, 81 L.Ed.2d at 388, fn. 5; U.S. v. Ford (C.A.1, 1994), 22 F.3d 374, 377.
"[T]he purpose of the inevitable discovery exception is to prevent the setting aside of criminal convictions that would have been obtained without police misconduct." State v. Pearson
(1997), 119 Ohio App.3d 745, 754, 696 N.E.2d 273, 278, citing Nixv. Williams, 467 U.S. at 443, 104 S.Ct. at 2509,81 L.Ed.2d at 387, fn. 4. "If the state does demonstrate, by a preponderance of the evidence, that the evidence would have been discovered by lawful means, the deterrence of police misconduct has such little basis that the evidence should be allowed." Pearson,119 Ohio App.3d at 754, 696 N.E.2d at 278, citing Nix v. Williams,467 U.S. at 443-444, 104 S.Ct. at 2508-2509, 81 L.Ed.2d at 387-388.
Even if we assume, for the sake of argument, that Officer Davis's warrantless search of the apartment was illegal, we are unpersuaded that the trial court was required to suppress the evidence seized in the subsequent search. The suspect was seen in a striped shirt by Blandenburg before the incident. Slauter indicated that her attacker was wearing a striped shirt. Hollins saw Reddish in a striped shirt walking down the alley immediately after the incident and watched him enter the apartment building. Furlow saw Reddish "messing around" in the bushes at the exact location where Slauter's purse was later found. When the police officers arrived at Reddish's door shortly after the incident, he did not have a shirt on and was "sweating profusely * * * almost like he'd been swimming," even though the officers could feel the air conditioning from inside the apartment out in the hallway. When questioned on his whereabouts, Reddish "said he'd been there all day." Given the number of people who saw the suspect and Reddish in a striped shirt, his sweaty condition despite the apartment's air conditioning and his claim of having been at the apartment all day, and his lack of a shirt when the police arrived, we have little doubt that the police would have sought the search warrant regardless of Officer Davis's prior discovery of the wet striped shirt. See Clary, at *3-*4. We further note that the facts which gave rise to the probable cause were present and known by the police before the warrantless search occurred. Thus, the record supports the trial court's conclusion that the striped shirt would have inevitably been discovered. Therefore, the trial court did not err in overruling Reddish's motions to suppress based on Officer Davis's warrantless search of the apartment.
Reddish also argues that the trial court erred when it concluded that Officer Davis's protective sweep the apartment had been justified. He claims that Officer Davis did not perform the protective sweep of the apartment for safety purposes, because the police knew that he was the suspect and that no weapon had been used during the attack. Reddish asserts that the officers created exigent circumstances to justify the warrantless search which was, in reality, executed for the sole purpose of finding the striped shirt. Reddish further argues that the trial court erred when it concluded that the seizure of the shirt was authorized by the plain view doctrine. In its denial of the motions to suppress, the trial court noted that "whether the shirt was left [in the apartment by Officer Davis] for later seizure via warrant is immaterial since seizure would have been authorized pursuant to the plain view exception." Protective sweeps and the plain view doctrine are exceptions to the rule that warrantless searches areper se unreasonable. State v. Greene (June 30, 1997), Franklin App. No. 96APA11-1591, unreported, at *2.
Because we concluded, supra, that the police would have inevitably discovered the evidence in question, we do not reach the merits of whether this search fell within the protective sweep or plain view exceptions to the warrant requirement.
With regard to his motion to suppress the identification, Reddish argues that the trial court erred when it failed to suppress the results of and testimony surrounding an unduly suggestive and unreliable show-up identification. In its ruling on the motion to suppress, the trial court pointed out that Slauter was unable to make a positive identification of Reddish and that "[t]he totality of facts of this case without more do not indicate that the show-up was prejudicially suggestive."
At the hearing on the motion to suppress, Sergeant Michael Martin testified that he had been involved in the show-up procedure when Reddish was taken to the store and viewed by Slauter. He testified that Slauter had "stated to [him] that [Reddish] matched the physical size and shape of the person that had grabbed the purse, but that she did not get a real good look at the face. So, she could not identify him by face, only that he matched the description of the individual's size and shapewise."
Based upon this testimony, we cannot conclude that the trial court erred when it found that Slauter was unable to make a positive identification of Reddish. Although she was able to give a general description of her attacker and she was able to say that Reddish matched that general description, she was unable to identify his face or to definitively say that he was the attacker. We also note that Reddish, himself, argues in his first assignment of error that Slauter did not definitively identify him. Furthermore, we agree with the trial court's conclusion that the facts surrounding the show-up do not indicate that it was prejudicially suggestive. Thus, Reddish's argument regarding the show-up and identification is not persuasive.
The second assignment of error is overruled.
The third and fourth assignments of error are interrelated so we will address them together.
 III. THE JURY'S VERDICT FINDING DEFENDANT-APPELLANT GUILTY OF GROSS SEXUAL IMPOSITION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 IV. THE PROSECUTORS IN CHARGE OF DEFENDANT-APPELLANT'S CASE COMMITTED PROSECUTORIAL MISCONDUCT WHEN THEIR CLOSING ARGUMENT CONTAINED A STATEMENT OF FACT NOT SUPPORTED BY THE RECORD.
Reddish argues that his conviction of gross sexual imposition is against the manifest weight of the evidence. In support of this argument, he asserts that the state failed to offer evidence that he had sexual contact with Moon aside from inserting his finger into her vagina. He claims that, in an attempt to prove the gross sexual imposition charge, the prosecutor argued during closing arguments that Reddish had touched Moon's breast, but that the evidence presented at trial did not support this statement.
Initially, we note that Reddish failed to object to the prosecutor's statement during closing argument at trial. Accordingly, our review is limited to the plain error standard of Crim.R. 52(B), which is described supra. See Miller,105 Ohio App.3d at 691, 664 N.E.2d at 1317. When considering a claim that a conviction was against the manifest weight of the evidence, the appellate court, after "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed.'" State v. Thompkins (1997), 78 Ohio St.3d 380, 387,678 N.E.2d 541, 547, quoting State v. Martin (1983), 20 Ohio App.3d 172,175, 485 N.E.2d 717, 720-721.
Reddish was convicted of gross sexual imposition pursuant to R.C. 2907.05(A)(1), which states:
 (A) No person shall have sexual contact with another, not the spouse of the offender; * * * when any of the following applies:
 (1) The offender purposely compels the other person * * * to submit by force or threat of force.
"Sexual contact" is defined as "any touching of an erogenous zone of another, including * * *, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).
At trial, Moon testified as follows:
 Q. Now, while you were there at the mail trucks, I want to ask you a question. Did he place any part of any part of his body into your private part?
A. Yes.
Q. Can you tell us when that happened, please?
 A. He had put his hand down part of my dress, feeling on my dress. He stuck his finger in my underwear. Was putting his finger up in my vagina.
Moon stated that Reddish had put his hand down her dress and her answer was given in response to a question regarding whether Reddish touched her private parts. Based upon this testimony, the jury could have reasonably inferred that Reddish had put his hand inside the top of her dress and had touched her breast. We cannot conclude that the jury created a manifest miscarriage of justice when it found Reddish guilty of gross sexual imposition.
During closing arguments and while discussing the evidence relating to the charge of gross sexual imposition, the prosecutor stated, "The first thing he did sexually was put his hand down her dress and touch her breast." Reddish argues that this statement was prosecutorial misconduct that substantially affected his rights because the statement was not supported by the facts in evidence.
Prosecutors may not allude to matters that are not supported by admissible evidence. State v. Lott, 51 Ohio St.3d at 166,555 N.E.2d at 300. They are, however, "entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence." State v. Smith (1997), 80 Ohio St.3d 89,111, 684 N.E.2d 668, 689, certiorari denied (1998),118 S.Ct. 1811, 140 L.Ed.2d 949. Based upon the testimony, the prosecutor did nothing more than state the reasonable inference that Reddish had touched Moon's breast. Thus, Reddish's argument that the prosecutor's statement was prosecutorial misconduct is not persuasive.
The third and fourth assignments of error are overruled.
As all four of Reddish's assignments of error have been overruled, the judgment of the trial court will be affirmed.
FAIN, J. and YOUNG, J., concur.
Copies mailed to:
Cheryl A. Ross
Charles W. Slicer, III
Hon. John W. Kessler
[1] The trial court record consistently refers to the defendant in this case as "Artess Lewis Reddish." In defendant-appellant's pro se notice of appeal and in a letter that he personally wrote to the trial judge, he spells his name as "Artis Reddish." Thus, we assume that "Artis Reddish" is the correct spelling and have captioned our opinion as such.